Good morning again, and may it please the Court, Kevin Lafke on behalf of Shane Dawson. As you know, Mr. Dawson worked for the company Entek for only a month, and the primary issues that I'd like to talk about this morning include the hostile work environment that he was subjected to, as well as this burden-shifting legal issue under Oregon law. I'd like to start with the hostile work environment. We know that Mr. Dawson was daily subjected to a variety of disparaging comments, such as homo, worthless queer, tinkerbell, fag, that he liked to suck dick and take it up the ass. He had one of the harassers get in his face, that's a quote, and intimidate him. And the district court, when faced with this litany of disparaging comments, held that those comments were not because of sex. And that is an inappropriate ruling, which I urge this Court to reject specifically. Well, on that one, I'm afraid there's nothing that will work for me, because in his deposition, the plaintiff himself says, well, no, that didn't, not to my knowledge. So for me, Title VII is off the table. I don't speak for my colleagues, but it seems to me that his own deposition testimony takes Title VII off the table. Well, Judge, I'll just leave it with this comment, then, before we talk about burden-shifting, and that is that the notion of because of sex is different from the deposition testimony about whether a plaintiff exhibits stereotypical masculine characteristics or thinks of himself as particularly masculine or feminine. The comments that were made to Mr. Dawson on a daily basis were comments made because of sex. And as a result, I'd invite you to think about that in the context of those comments and whether it makes a case as a matter of law under Title VII hostile work environment. Obviously, we also have claims under state law, and one of the big legal issues in this case is the burden-shifting. And as we noted in our reply brief and a footnote, many judges in the District of Oregon have rejected the burden-shifting under state law in federal court when there's supplemental jurisdiction. Sneed, of course, from the Ninth Circuit talks about diversity jurisdiction, and I certainly acknowledge the Exxon Valdez case cited by the employer here in terms of that there doesn't appear to be a legitimate distinction in looking at the adoption of state law principles differently in diversity cases versus supplemental jurisdiction cases. But I would like to invite this Court to reconsider Sneed and to think about what's said in Exxon Valdez and what's said in Sneed. We can't. Meaning, if we weren't on bond court, we could. But as a three-judge panel, we can't. And again, speaking only for myself, Exxon Valdez got it right. Well, and I agree because Exxon Valdez says where state law supplies the rule of decision, it is the duty of federal courts to ascertain and apply that law. And that's not what's happened here because the situation with state laws, as you know, it doesn't involve burden shifting in Oregon State Courts. Well, here's my position. Again, I don't speak for my colleagues. I think it is a given, and on this point Exxon Valdez is clearly right, the same rule with respect to the eerie division between procedure and substance applies irrespective of the source of jurisdiction. If you're applying a state law cause of action, it doesn't matter whether there's a federal question case, a diversity case, or a supplemental jurisdiction case, the rule will be the same as to what is procedure and substance with respect to state law. Boom. Now, you can argue that this is state substantive law, but you lost that in Sneed. Boom. I understand, Judge. And where Sneed, with respect, goes wrong is when Sneed says that, if I can get the right language here, that it would only delay the inevitable whether you apply burden shifting or not. And under Oregon law, that's just simply wrong. And, of course, there was a dissent in Sneed, and the dissent doesn't argue this point, so I can only assume that the point was not briefed or argued in Sneed. But in Oregon, when you make a prima facie case, your case goes into the jury room, and that's not delaying the inevitable. That's a determination of fact that the jury makes. When you have a prima facie case under Oregon law, it doesn't get dismissed on directed verdict under ORCP 60. It doesn't get dismissed on directed verdict at the end of all the evidence. It goes into the jury room. And so where Sneed says that only the timing of the case's dismissal would be at issue and that this is merely a procedural device, that's clearly wrong under Oregon law because the lack of burden shifting is substantive and makes a profound difference in how employment cases are litigated when there is or is not burden shifting. Prima facie case doesn't just get you past summary judgment in state court. It puts you in the jury room. And that's a substantive issue, not just a mere procedural device.  But there's a reason that these district judges, as cited in the footnote in the reply brief, are making this distinction between pendant jurisdiction and diversity jurisdiction. And maybe it's not an intellectually consistent argument. Maybe they know about Exxon Valdez, and that's not the way that it ought to be done understanding the law of this circuit under Erie and under the distinction between different forms of federal court jurisdiction. Yeah. Now, remind me. I should know this, but I don't. Was this case removed from state court or was it originally filed in federal court? My recollection is that it was removed. Uh-huh. And so, again, you see the challenge here for the plaintiff because... Yeah, if you stayed in state court, you would have had the other rule. That's right. And it is substantive. It has to be. Yeah, maybe you should have left that Title VII claim off. Well, hindsight is perfect, and I certainly understand this court's limitations. And this is obviously an important issue for Oregon employment litigation, and there's obviously a dispute amongst the district judges in Oregon as to how this matter is being handled, and they're distinguishing between supplemental jurisdiction and not applying burden shifting while at the same time following the rule in Sneed on diversity because Sneed specifically cites diversity. Well, we probably have to play the hand we've been dealt. Let's assume that we've got burden shifting and we're following Donald Douglas. As I see the case here, here's the timeline. He's tormented over his homosexuality. That seems not to be in dispute. Maybe the word torment could be, but he's certainly being subjected to adverse behavior, unwelcome behavior. According to his version of the story, and this is summary judgment, so I'll take it that way, he finally just says, I can't stand this anymore, and on Saturday he calls in a half an hour ahead of time saying, I'm not coming to work. That violates company policy. He should have called in an hour, and it also violates company policy. He should have called the supervisor rather than the person he called. On Sunday, he goes in and talks to Susan Morch, the HR person, talking about all the sexual harassment that he's been subjected to. On Monday, the company decides to fire him. Now, the Campbell declaration says, and that's Campbell who's head of HR, she says, we decided to fire him, and only then on Monday does Morch come up to me and talk about all this sexual harassment stuff or homosexual harassment stuff. And then on Tuesday, he's fired. As I read the district judge's order, the district judge doesn't give me quite that time sequence. The district judge's order says at more or less the same time that he is talking to Morch about what's happened to him, the determination to fire him is made. Well, that's not true. He talks to Morch on Sunday. The determination to fire him happens the next day, which, of course, leaves time for Morch to have called various people, maybe other than Campbell. I mean, maybe the first time she talked to Campbell was Monday, but she might have talked to other people in the company before then, or she might not have. And, of course, the plaintiff doesn't know. I mean, he's not in a position to figure out except by inference who's talked to whom when. What he knows is he complained on Sunday, and it gets canned on Tuesday. So what inferences are we supposed to draw from that? Well, I think certainly the inference you have to draw from that is that management is aware of his complaints. Morch is aware of his complaints. And the district court at ER-5, the district court's opinion states, again, as has been discussed in the employer's brief, the district court refers to Morch as monarch. But in the order here at ER-5, at the top of the page, the finding of the district court, quote, monarch took notes of the complaint, meaning plaintiff's complaint, and the people involved and forwarded the information to Campbell, end quote. And so under the district court's logic alone and factual finding right there, Campbell's got this information about the complaint before participating in the termination decision. And that's one more reason, not just the timing, but one more factual basis for, at least in the inference, who's capable of the complaint. Do we know the degree to which Morch may or may not have participated in the firing decision? I don't believe. I see nothing in the record that says that she actually participated in that decision. That's correct. I don't believe there's anything in the record that suggests that Morch was part of the three people that fired plaintiff. But you're suggesting that she communicated it to Campbell. Yeah. You also argued in the, as I recall, I think you argued in the district court, but I don't see it in your briefs on appeal, that Gazan was part of management, that he was a supervisor. Certainly. Have you given up on that? No. I didn't find it. Never give up, judges. Well, I understand. But when you don't argue it in your appellate briefs, you do, so. I think that, you know, given the short, you have to think about that argument in all seriousness in relation to plaintiff's short time frame in the workplace. He only worked there a month. I know, but it's a legal question. In other words, if, let me finish. Gazan, if your theory is that Gazan was a part of management as a supervisor, not that he could hire and fire, but that he was a supervisor, and, therefore, management was aware, then the question is, do you have any additional traction on your argument that management collectively was aware? Two things. Plaintiff certainly understood that Gazan was part of management and was in a supervisory position, and that's what plaintiff testified to. And I believe in his deposition he said, well, then later I learned that that wasn't really true, and the later is kind of unclear whether that meant after he was terminated and in discovery or some later time. All right. So that's why it's a legal question, though. You need the factual predicate. Whatever your client's impression may have been, are you arguing, as you did in the district court, that under Lamb, which the district court rejected, that Gazan was a supervisor as a matter of law because he had the attributes set forth in Lamb? Yes, we certainly argue that Gazan was part of management and was a supervisor and that plaintiff understood him to be such. And the second part of the issue there that's important, I believe, is that we know from the deposition testimony at ER 84, the manager testifying about knowing about the use of the word homo in the workplace, and there's some argument about, well, how long did that go on? Well, here's the quote. Quote, it had been used for a few years, end quote. So the employer disputes that few-year comment in the blue brief, but it's right there in the manager's testimony. What, if anything, did you do about preventing employees from using that term in the workplace? Answer, I did nothing. And so certainly management knew about this problem. And the district court relies on a case called Hartage to say that plaintiff had to be the source of management knowing about the problems in the workplace. But Hartage, when you look at it, relies on a case called Zimmerman v. Cook County, and what Zimmerman says is that's one way that the employer could know about it from learning about it from the plaintiff. Other ways include the pervasiveness of the problem in the workplace where management knew or should have known. Here management knew. They admitted in the deposition testimony. They admit they did nothing about it. Thank you. Okay. You're almost up to your time. We'll hear from the other side, and we'll give you a minute to respond. Thank you. Good morning, and may it please the Court. P.K. Rungles-Pearson for ENTEC International. And I want to start basically in the order that Mr. Rafke went. I think, first of all, I can provide the Court with some information. This case was filed directly in district court. It was not removed. Okay. So plaintiff did choose that. As you pointed out, Judge Fletcher, we believe that Title VII is off the table. The plaintiff admitted in his deposition that he was not particularly masculine, he was not particularly effeminate, that he did not believe that anyone that he worked with, any of his coworkers who had made these comments, did so because he was effeminate, because he said he wasn't. And in fact, that's a theory that plaintiff pleaded in his complaint, which we've attached in our supplemental excerpt of record. His Title VII theory was based on a sex-stereotyping, Price-Waterhouse-type theory, and plaintiff himself simply threw that theory under the bus. As to Snead, I think I don't need to spend a lot of time on this. I think it's pretty clear that this panel is bound by the opinion in Snead. Isn't Snead wrong, though? No, I don't think that Snead is wrong. I have no control over whether it's right or wrong. I have to follow it.  Mr. Lasky. But wouldn't you much prefer to defend this case in Federal court rather than State court because of Snead? Well, I think that Mr. Lasky acted as if Snead didn't talk about the problem of whether or not something would be sent to a jury, and in fact, that's not true. Snead expects that. No, let me ask you a different question. Don't worry. I'm going to follow Snead. But aren't you happier defending this case in Federal court than you would be in State court on the question of State law? To be honest, I prefer Federal court, but not because of McDonnell Douglas as much as because of the fact I can get my pretrial filings in a month for four. But it does seem to me that the Oregon rule on the Primer-Fisher case is more advantageous to the plaintiff. I just don't see any way around it. But don't worry. I'm following Snead. Sure. And I won't waste a lot of time on that, but I think that what the Court found in Snead is that even if it does make a difference at summary judgment, it doesn't ultimately make a difference with where the case is going to go. And so as a matter of trial procedure and the allocation of the burden between judge and jury, which Byrd says that Federal courts are allowed to decide, then  And, yes, it may be easier for defendants because we don't have to go to trial, but that doesn't address whether or not it's outcome determinative, which Snead determined it wasn't. So Snead, together with the Exxon Valdez case, I think, made pretty clear that McDonnell Douglas applies here. So here we go with McDonnell Douglas. Right. Here we go with McDonnell Douglas. So I'd like to correct the record a little bit on some of these factual questions, and I think that your summary of the facts was pretty accurate. But the district Not entirely? I beg your pardon? You say pretty accurate implies not entirely? Pretty accurate. Not entirely. For example, you referred to it being a Saturday-Sunday issue. In fact, it was Monday-Tuesday. Wait a minute. He didn't come into work on Saturday, correct? That's not what the district court opinion said, but that's Well, that's what he says. I don't care what the district court says. I care what he says. He says I didn't come into work on the 19th, which is Saturday. Okay. And then he says the next day. I mean, I went back. Unless my computer is really wrong in terms of telling me what the days of the week are in 2007, I went back and looked. The 19th when he didn't come into work was Saturday. The day he talked to March, which he says the next day, is Sunday. That's weird. HR works on Sundays? Yeah. You're certainly entitled to take judicial notice of that. But what's important is the sequence of events here and the fact that the district court, in fact, while it didn't rely on the fact that Ms. Campbell and Mr. Shimin and Mr. Elliot, who made the decision, actually made the decision before they ever knew about the human resources complaint, That's what Campbell says. That's right. That's correct. And, of course, people lie. I'm not accusing Ms. Campbell of lying. I hope not. She's sitting right there. But people lie or are mistaken. And, no, I am not accusing her of lying. But, you know, people say stuff. In the summary judgment, we believe the party opposing summary judgment. And he's not in a position necessarily to contradict. And, you know, we'll deal with all the complications of what people know and don't know. Well, in fact, this circuit has previously decided that on summary judgment, you must believe the evidence that's there without weighing credibility. And that's the Bodette v. Coxcomb case, which is 366 F. 3rd, 736. So, you know, whether or not later on someone might believe or disbelieve the decision-makers here, the fact is that there's no other evidence. And the trial court specifically found, although it didn't rely on that finding, it found, and we've cited those portions in our brief, that the decision was made before the decision-makers ever heard about the complaint of sexual harassment. And there's no evidence that Ms. Morch was involved at all. Well, the evidence that you presented says that. But there's no contradictory evidence. No, I think there is at least a possibility of an inference that that's so. Because we know from Ms. Campbell's declaration, or at least I'll say she states in her declaration, that she talks to the people and they decide to terminate him. And then, I don't know whether she says immediately after, but after Morch comes up to her and tells her about this. Now, I don't quite have the time of morning, which I wouldn't really expect. Let me look at this Morch thing. Sorry to hold you up. This is my... Ms. Campbell specifically mentions Morch. Oh yeah. On Monday, after I spoke with Elliot about it, human resources assistant Susan Morch informed me. Now, it doesn't say how much after. We do know that Campbell tells us that Oakley tells her in the parking lot as she's coming to work in the morning. Hmm. That's right. And there's actually further deposition testimony that the trial court relied on, making its finding that we cited in our concise statement of material fact. Mr. Elliot and Mr. Schimann also testified in their depositions, and Mr. Elliot also in a declaration that all of this decision making occurred before they ever heard about any complaint of sexual harassment. Now, is it clear that he didn't come to work on the 19th? Yes. Yeah. And it's clear from the date here we're given that Monday is the 21st. Yes. He says, this is the plaintiff, says, and he's not contradicted on this point, that he talked to Morch the day after he didn't come in. That's because of the way the shift works. The shift actually works over the 19th, 20th, and then the complaint is the 21st. No, no, no, I'm after the date on which he talked to Morch. He says, I went in and talked to Morch the next day. Right, but the reason that the next day is strange is because of the way the shift works. The shift is over the 19th, the 20th. So the next day is the 21st. So it's undisputed that the conversation about the termination because of his not following attendance policy occurred around the same time as he was speaking with Ms. Morch, and that's what the district court found. Okay. You can be corrected if the other side disagrees with you, but the next day in your understanding does mean Monday. Right. And the district court held that, and, in fact, that finding of fact has not been challenged on appeal. That, then, is what the district court means when the district court says at about the same time. Correct. This is both happening sometime on Monday morning. Correct. So all of this is happening around the same time. And why isn't that proximity in time sufficient to carry the burden of the plaintiff? The proximity in time isn't sufficient. The proximity in time isn't sufficient. I beg your pardon, Your Honor. Go ahead. The proximity isn't sufficient because there's a break in the causation, because you can't have a prima facie case to begin with. And we cited the Cohen case in our briefing. That was a case in which the plaintiff had filed a complaint with the EEOC and then later on brought a complaint that he had been fired in retaliation for the EEOC complaint. And what this court held is that if the supervisor or the person who's supposed to be retaliating has no knowledge of the protected activity, there can't be retaliation because you have to be motivated by something. If you don't know about it, you don't know about it. So the case that the cases that talk about temporal proximity don't have this situation, if there were no intervening cause or if there were no or if there were knowledge, then you might be able to draw the inference at the time. Now, are we required to – and this is different – with all respect to you, this is different from accusing you of lying. This is a different question. Are we required to believe for purposes of summary judgment Ms. Campbell's narrative as to sequence? Yes, You are. Why? Because this Court has already decided that issue in the case I cited to you earlier, the Bodette v. Cox-Conk case. And tell me – give me the reasoning. I'm not – Well, the reasoning is that it's – summary judgment is an issue about whether there is a dispute of material fact. Right. Which means you have to look at the facts that are there and then draw all the inferences in the plaintiff's favor. I understand that. And here there are no facts that contradict this evidence. But here's my problem and why I'm asking the question. The plaintiff here is not in a position to contradict. He simply has no knowledge on this point. What he has is a suspicion that I have to say, you know, there's a little bit of – there's a little bit of smoke here. That is to say, he's been subjected to this treatment and he, according to his story, which we do believe, he just can't take it and calls in later than he should and to the wrong person on Saturday and doesn't come in. And he's canned on Monday. And then they tell him this story, well, we made the decision to can you before we heard about the complaint. Well, that's what they say. But, of course, it's very much to their advantage to say that. He has no specific information based on which he can contradict. So I come back to the question, why do we have to believe that when at least there's an inference without that statement that, in fact, the sequence went the other way and this is uncorroborated except by people whose significant advantage it is to tell the story in that fashion. So why do we have to believe it? There's a couple answers to that question. First of all is the procedural one that I already described based on the facts. But the second one is that here's where McDonnell Douglas really comes to the plaintiff's rescue. In other words, you really do like Snead. If the plaintiff were able to show any pretext, any reason for why this policy didn't quite make sense, didn't quite add up, if there were other comments, for example, made by the decision makers that they don't like people who make complaints or they don't like homosexual people or something like that, any of those things could have helped the plaintiff to overcome that evidence through showing a pretext. And, in fact, the plaintiff has nothing in this case. So what do we get this? I don't understand what I'm supposed to make of it. I am on ER 90. It's the investigation done by Ms. Campbell Rivers. Supervisor Ken Haas, I'm reading the second paragraph. Do you know it or should I wait for you to get it? It's ER 90. Yes, Your Honor. The second paragraph, this is the investigation report, an investigation report by Ms. Campbell Rivers. Second paragraph, Supervisor Ken Haas was unaware of any teasing aimed at a contemporary employee. He did receive a comment from one employee about Roger. That's to say Roger Baker. Roger Baker got rid of Shane for you by using teasing language. Now, what does that mean? I'm not sure. I'm not sure it's supported by the record. I mean, this is the record. I'm not sure the explanation is supported by the record. What I can tell you is that Mr. Dawson was not known as being an excellent  Not that this is a great comment. Well, I read the position description. I think it was Mr. Shemin says he was about average. He, quote, wasn't the ball of fire, close quote. But they're not trying to get rid of, this is by the testimony of the company, They're not trying to get rid of somebody who's a bad employee. No. He sounds like he's average. Right. And quite frankly, other than that, I'm not sure what this comment is about. There is no evidence that Mr. Haas had any kind of animus towards the plaintiff. And, in fact, this is a comment that Mr. Haas is reporting to Ms. Campbell Rivers that he heard about from somebody else. Yes. So, I mean, why would he do that? When I say what status do we attach, I don't know the answer. Right. Could you address Guzon's status? Thank you. Yes. There's no evidence whatsoever that Guzon was a supervisor. And the trial court explicitly found that, that he is a co-worker who trained plaintiff on production machinery. Yeah. That's what the evidence states, and that's a finding of fact that hasn't been challenged here on appeal. So, even if Guzon was a supervisor, which there's simply no evidence that he was, then it wouldn't change the balance. Apparently, he shifted people around, didn't he? He did more than just train them. He put people in different positions. Quite frankly, I'm not aware if he did that. He had the lead. He had a lead title, you know, whatever it was, the lead something. I think that what's important here is that the only difference that him being a supervisor would have made, assuming that evidence was here, is that then we would look at whether or not he created a tangible employment action against the plaintiff. Well, also, but, well, if there's a hostile work environment that's been created by a supervisor, and he was part of it, and he clearly had knowledge of the others, why wouldn't that read on the hostile work environment claim? Wow, you've just raised a lot here, and I have a very short time. Well, that's okay. You're going to get it because you have time to answer my question. Thank you, Your Honor. Just to reassure you, you get to talk as long as we get to ask questions. Thank you, Your Honor. And we get to decide how long we ask questions. One of the things you've raised that I think is really important to talk about is the issue of notice. And I think that implicates the Hartage case that Mr. Lafke raised earlier. So even assuming there's some evidence here that Mr. Schimann and Mr. Haas had heard the word homo being bandied around the workplace and that they did not crack down on it. That would be the same situation that Mr. Guzon would be in. The issue here is whether or not in the Hartage case the supervisors knew that something was going on that could, under some indication, be part of a hostile work environment, but there was no indication that the conduct was unwelcome. And here there's no evidence that Mr. Guzon, Mr. Haas, Mr. Schimann, anyone else, knew enough to put them on notice that they had to respond. So, I mean, even assuming that Mr. Guzon was a supervisor and that, therefore, he knew, as part of management, knew about this word being bandied about, the only person who could have ---- There was more than just one word. There were a lot of them. Well, there were other words. There were. Contributive statements, demeaning statements. But what's important is that the only person who could tell them that that language was unwelcome is Mr. Dawson, and that's the same thing that happened in the Hartage case. But he didn't tell anybody. Right. He didn't even tell Guzon. Correct. He didn't tell anybody. He told nobody until he told Ms. Morch. And then as soon as Ms. Morch learned about it, the company did what it was supposed to do, investigated. There's no evidence that anything like that ever happened again. So in terms of what impact that really has, if Guzon was a supervisor, first of all, there's no evidence that he was, and the district court found that he was not and found that he was simply a production supervisor who trained plaintiffs on production machinery. There's no evidence that Mr. Guzon ever took any adverse employment actions. So if he had been black, for example, and had said nothing, and they called him a nigger, all this time, you're saying that because he didn't evidence any reaction to it, this is hypothetical, that it's the burdens on the employee to speak up and say, I don't like this. Yes. So you can have a totally racist environment, and if the employee doesn't raise his hand, then the employer is home free. Your hypothetical changed. The first hypothetical was where you were saying that the N-word was used. There are lots of instances in which the N-word is used, even between white people, between African-American people, between a white person or a black person, and it's not unwelcome. The second hypothetical that you raised, Your Honor, was where it was a pervasive racist environment, which I think is different. Let me ask you this, if I may. What evidence do we have as to the company's policy with respect to temporary employees? He was a temporary employee. Yes. Who don't comply with the one-hour call your supervisor requirement before not showing up. There is evidence of past practice. Yes, and I want you to describe that past practice. Well, two other, Ms. Campbell testified in her declaration that there are two other temporary employees who have been terminated for no-call, no-shows like this. Now, like this, do we know from Ms. Campbell-River's declaration that the other two attempts that were fired for no-shows were fired after only one? Let me just look at that. I don't recall whether it says anything more than that. The reason you don't recall is because it doesn't say. Okay. Then I don't know. But the fact is that there is a clear policy violation and other people have been terminated for violating this policy. Well, but what I'm really interested in is if, in the past, people have been terminated for no-shows after two, that supports the plaintiff. If they've been terminated in the past after one, that supports the defendant. And this declaration appears to me to have been prepared in anticipation of litigation. I mean, it's a declaration that shows up in litigation. I assume that it was prepared carefully. And it strikes me, it kind of jumps out at me that the declaration does not say fired after one. What it says is, I'm aware of at least two temporary employees other than plaintiff who have violated in-text call-in procedure for unscheduled absence, says, plural, and whose employment was terminated for that reason. One was hired on May 17, 2006, terminated on September 20, 2006. The other hired on April 6, 2007, terminated on April 10, 2007. It does not say terminated after one no-show. And I assume that whoever put that together, Ms. Campbell, maybe with the assistance of a lawyer, was careful and accurate. But what's missing here is from saying after only one. What am I to make of that? Well, I think that you need to step back and evaluate where this evidence comes in. The primary place where this evidence comes in is on a claim that hasn't been appealed here, which is a disparate treatment claim. And under the disparate treatment claim... But it's now being used as defense on that pretext question. Well, I think that there's... In a way, I don't care why it came in. It is in the record, and I'm trying to figure out what it means. Well, there's so much other evidence related to... In order to get to the pretext question on a retaliation claim, for example, you have to show, which plaintiff hasn't, that these decision-makers knew about this. I'm assuming for the purpose of my question that they did. Okay. So when you finally get to pretext, I don't think that this shows that other people were treated differently. And that's on pretext... But does it show that other people were treated the same? But that's not plaintiff's burden on pretext. Plaintiff's burden on pretext is to show that others were treated differently or that there's something wrong with this explanation. Yeah. I mean, this one's hard because it seems to me that this declaration was drafted quite carefully, even down to the point of somewhat oddly saying paragraph 6. No, it's not paragraph 18. No one named Troy Guzman was employed at NTAC during the same time the plaintiff worked there. What's that doing there? Well, that was their... I know exactly what that's doing there. You're saying you didn't spell his name right. No. It's that the plaintiff talked about a Troy Guzman in his deposition, I believe, and the appropriate name was Troy Guzon. That's what I mean. Right. So it wasn't used to... It's a snippy little comment in a declaration that's being prepared very carefully. And this declaration that's being prepared very carefully doesn't say fired after one no-show. I take your point, Your Honor. But at the same point, I don't think that that gives the plaintiff affirmative evidence that they need on pretext to show that there was something wrong with the explanation. With Judge Fletcher's authority, I'll ask a question. This was a graveyard shift, right? Yes. I'm trying to picture this work scene, this work site. They were all males, some 20, in the middle of the night, right? Yes, that's my understanding. One homosexual on that assembly line, that's our plaintiff here, right? If the plaintiff is to be believed, yes. All right. He's got a man by the name of Troy who's telling him what to do, how to do it, when to do it. Were there any other supervisors there? There are other supervisors. On the graveyard shift? I'm not aware of that. All right. So here's a guy in the middle of the night telling Troy all those things. He can't do anything unless he goes to Troy. He doesn't know how to work unless Troy tells him. Why couldn't Troy be a supervisor? Well, first of all, I'm not aware whether the other supervisors were present at the time. But in order to be a supervisor, you need to have some sort of hiring or firing authority, and Mr. Grison has none of that. It's just that the plaintiff, who's been there for a very short period of time, believes that Mr. Grison is his supervisor. He doesn't have to have the authority to hire or fire, does he, to be a supervisor? He has to be able to direct some sort of something that could create an adverse action for the plaintiff, some sort of management authority, and there's no evidence that he has that. And in response to your description of the difficult situation that the plaintiff was in, if he's to be believed, his remedy is to go to HR. And, in fact, the evidence is that he did so after a week. But didn't he go to Troy first? He complained to Troy. He could have. He did. I'm not aware if he did. He said he did. Well, it's in the record. Okay. He said. There's no evidence that Mr. Grison is a supervisor. I'm assuming he knew, but I will say that I had gone to Troy before or shortly after. When I went to Germany, I went to Troy and mentioned something to him. You've represented to us that none of these people was aware. He never complained. His testimony is that he did. I beg your pardon. That was my mistake. That's a big mistake, isn't it? But I think the important thing is that you have the news on that ground, don't you? There's no evidence that Mr. Grison is a supervisor here. So that's what it would turn on. I believe it does. And the district court made that determination, and it actually hasn't been challenged on appeal. Okay. Any further questions? Thank you. Well, we took the other side over. By 10 minutes, we'll give you a minute in response. But if you go over that a little bit, it's okay. Let me try to answer the questions that the court has posed, but first apologize for my misstatement about the removal versus the initial filing. That's okay. That was incorrect. At the bottom right-hand corner of ER 37 is the deposition testimony of plaintiff regarding his understanding of Guzon and his status. He says, I was told to go with any problems or questions that I had because he was another one of the supervisors as far as I knew. I never really dealt with any of the other supervisors at all. That's at the bottom right-hand corner, ER 37. We know that Guzon also called plaintiff homo three or four times. That's ER 42, deposition page 69. This is the question from employers' counsel. What words did Troy Guzman use that referred to your sexual orientation? Answer, I had heard homo how many times, three or four times. And then in the declaration of plaintiff reproduced at ER 94, plaintiff states in his declaration, section 7, I understood that Guzon was my direct supervisor as I was instructed that if I had any problems, I was to talk to Guzon. I also saw him supervising other employees. There was some questioning about whether it was likely that plaintiff met with Morch on a weekend. Plaintiff testified twice. It looked like the questioner had a calendar, too, Judge. And they were asking him about, well, this is at ER 49. This may be important for me. Hang on. I'm on ER 49. Where do I look? Deposition page 96. It's the upper right-hand quadrant. It's the long answer in the middle. It starts there. It was two days afterwards I was terminated. I was called in the following day. That's probably where my dates got messed up. He's referring to earlier deposition testimony. So it was two days after I talked to Susan that I got terminated. Then the question had been ---- I'm sorry. This is not your fault. But okay. I'm on ER 49. I'm on page 96 of the depo. Yeah. And look at the question at the very bottom of that deposition page. If it's two days after, you would have spoken to Susan Morch on a Sunday. Answer, then I would have spoke to her on a Sunday, yes. Question, you believe she works on Sunday. Answer, she works. I know she did work the weekend schedule because a lot of times she was in there. I'm pretty sure I talked to her on a weekend. So we are back to Sunday, then, according to his evidence. Yeah. So, again, just so there's ---- Before he said Saturday in his deposition testimony. And he also testified in that testimony. That, just for your reference, is ER 45. But he never says Monday. No. Okay. Boy, I was over to Monday. Thank you. That helped. I'm back at least to Sunday. And when defendants say there are no facts, there's no showing a pretext, well, the facts ---- one of the facts is the timing of his termination. And one of the facts that support pretext is this nasty, hostile work environment directed towards gay men in this workplace. The constant comments, the constant references, and the knowledge of management and the lack of any effort to do anything about it, that's evidence of this kind of pervasive environment directed in hostility towards gays. And that can support pretext as well. And so, again, you don't have to have three people sitting around saying we're firing him because he complained about something that, apparently, management knew was a problem for a long time. You're not going to have that kind of admission in an employment case. You're not going to have that kind of smoking gun. But we know we had the kind of nasty environment towards gays that existed here, and we have this very significant timing issue that on summary judgment should be resolved in the light most favorable to plaintiff in all inferences drawn in his favor. Okay. Thank you. Before we submit the case, I want to say one thing. This is not criticism of either. It's just designed to help you in the future for arguments in front of the Ninth Circuit or briefs. In preparing the excerpts of record, it's useful to put into those excerpts everything that you want us to look at. I don't think, because I looked for it and I couldn't find it, that the Campbell Declaration was in the excerpts of record. My locker pulled it out this morning from the electronic filings. But sometimes judges will be reading at home or whatever, or sometimes judges will be technological troglodytes like me, and I can't figure out how to get it electronically. So if you want the judge to see it, you should put it into the ER because that may be the only place the judge looks. We're entitled to look for the full record. You're entitled to rely on everything that's in the full record. But just in terms of facilitating your arguments, if you want the judge to see it, put it in the ER. I'm not criticizing. I'm just saying this will be a helpful tip for you. Okay. The case of Dawson v. Entik International is now submitted for decision. And we have one last case on the calendar, and that's United States v. Robert Darrell War Club. Thank you.
judges: Bury, Fletcher W. , Fisher